Good morning, and may it please the Court. My name is Dani Vincent with Bondurant, Mixon & Elmore, and I represent the plaintiff appellant, Erika Buckley, in this case, along with my co-counsel, Earl Burke. The question before this Court is whether there is evidence from which a jury could find that the decision to remove Ms. Buckley from federal service was tainted by discrimination. Because it could, the District Court should not have granted summary judgment to the government. In granting summary judgment, the District Court committed two primary errors. First, it did not correctly apply BAB. The District Court used a considered standard rather than whether the removal process was free from any discrimination. And second, the District Court made improper findings of fact with regard to the HIPAA violation. To start with, Ms. Buckley does not have to prove that Major Hsu considered her race or EEO activity in any sort of intentional or conscious way. A jury does not have to attribute any racial animus to Major Hsu. If we lay the theme for what Major Hsu arrives to in the Traumatic Brain Injury Clinic in 2017. Race, though, has to be the but-for cause of differential treatment, right? Of the treatment, correct. Yes, okay. So, notwithstanding whatever error the District Court may have committed in its statement of the standard, if we apply the correct standard, why would it make any difference in this case? Because the question is, but for the differential treatment, would the treatment have been, the decision in the removal process, been any different? And here, what matters is what factors went into Major Hsu's decision to pursue this removal. And I would submit that the context, that the environment she came into in early 2017 was already a racially charged environment. Ms. Buckley and Dr. Ribeiro had been working together for several years. I think the record is very clear that he harbored some racial animus. When Major Hsu arrived to the clinic in 2017, there was already a litany of patient complaints, which the record shows were encouraged by Dr. Ribeiro to have white patients complain against her. She had a very contentious relationship with Dr. Ribeiro, and the evidence shows that that relationship was in large part based on his perception of her and his treatment of her as, quote, an angry black woman. Now what we have is we have a black woman who is being assertive, who is advocating for herself. She's complaining about this treatment. She's complaining about the fact that these white patients are being referred off base, and it all feeds into this constellation that there is... a HIPAA violation. And really, when you look at the comparative treatment, there are white employees who were either discharged or allowed voluntarily to resign for HIPAA violations of the sort where your client was discharged because of a HIPAA violation. And to the extent that there were lesser sanctions imposed for HIPAA violations, there were black employees who received the lesser sanctions. So I'm not sure how race really has anything to do with differential treatment here. I mean, you know, insofar as other low-level employees may have engaged in conduct that had racial implications and were racially hostile, I'm not sure, though, insofar as the decision makers for this discipline or this, you know, action that's being challenged, how any of that had anything to do with this. So first of all, as to the other HIPAA violations, I think we just don't have enough evidence in the record to parse those out from Ms. Buckley's situation. Don't we know, though, that there... Well, I mean, the burden was on you to present the evidence in opposition to summary judgment. Don't we know that there were employees of different races, including white women, who were removed from federal service because of HIPAA violations? We do, but the... So if you look at that chart, I actually think there are two violations in there that are both black women that are... I would prefer that that's actually the same person who was initially given a reprimand and then is removed. The jury doesn't have to conclude that, but that's certainly available to the jury. The other piece I think is really important is that Ms. Buckley doesn't... Under BAB, Ms. Buckley doesn't need to show a comparator. What Ms. Buckley needs to show is that it was tainted. And what happened to Ms. Buckley is that she... Because that's my question in terms of how we apply BAB to this case. My understanding from Justice Alito's opinion is that it can be one of many factors, but the real test is what is the relief that you're seeking? And if she's seeking more than reinstatement, then having race be one of the factors is not enough. It has to be elevated to the determinative factor. Or what is your understanding in terms of how BAB impacts the relief that's being sought and then how that determines the standard? So I think there are two different standards, two different hurdles you have to get over in BAB. And the first one is the... Was she treated differently in the removal process because of her race? And that gets you limited remedies. And so that's one. Was there a violation in the first place? And then the second question, to get the full remedies, is was that... And I think there, was that the cause of her termination? And I think there, what we have is we're kind of back to the pretext analysis in Mosaic or McDonnell Douglas. And I don't think the government can overcome that because their imposition and their reliance in the guidelines is on a false provision of the discipline guidelines. The only reason that the government has given for terminating, not for reprimanding, not for suspending, but for terminating her, is this single unintentional HIPAA violation. And that egregiously exceeds the applicable guideline. And so I submit that under... It was her second? I think that is a disputed fact. Where's the evidence that makes that a disputed fact? Sure. So the... Let me see if I can... So what happened there is that Dr. Ribeiro put this memo in her file in 2014, but Ms. Simmons, who's in the privacy office, testified that she didn't have any record of that. That no HIPAA complaint had ever come to her office in 2014, and that the only HIPAA complaint at the time the decision, the proposed removal was recommended, she only had one substantiated HIPAA violation. Even if she had had a second one, however, the guidelines still don't reach to the level of termination if you're under the correct administrative regulatory violation. Is there evidence that she did not have the first one, as opposed to an employee saying, I don't have a record of that, when others are saying it did happen? I think in that it's a he said, she said, and there is conflicting evidence about that. She testifies that she is totally unaware of this HIPAA violation, and yet in discovery... If she testified to that, then that's the evidence. That's helpful. So, I think what we have, again, here under this analysis is that was, did Major Zhu, I think a jury is entitled to find that Major Zhu saw Ms. Buckley as a problematic employee. She comes in, she has this very hostile relationship with Ms. Shavers and Dr. Ribeiro. Her patients are being referred off base. Their white patients are complaining about her. We've got, she's now filed, by the time Major Zhu comes in, there are two active EEOC investigations going on. And I think a jury is entitled to look at that and say, look, like she comes in and you have a squeaky wheel who is, as I think the stereotype goes, as Dr. Ribeiro unfortunately characterized, we have an angry black woman. We have an uppity black woman who's standing up for herself. And that that constellation of events, whether Major Zhu herself has any sort of discriminatory intent, what she sees is a problematic employee. And when she is given the first opportunity she has to get rid of this problematic employee, maybe even just to boost morale in the clinic, she takes it. It is egregious overreach on the violation. And that ultimately a jury is entitled to connect those dots and say the reason for this aggressive treatment under HIPAA, the reason to pursue this so aggressively, is based on this kind of toxic, hostile, racially charged environment. And if that's true, then that racial differential treatment was the but-for cause of her termination. Because the government, on the pretext issue, the government can't overcome the fact that this is an egregious or absolutely a question of fact about whether or not that was appropriate. Let me ask you about the being late for the meeting. It's hard for me to see how anything in this record at least suggests that that had anything to do with race. It seems undisputed that she was late to the meeting. And without more, I don't know how we could say, without any kind of reference to that being in any way connected to race, how we could infer that that's about race. I think it's one fact that the jury is entitled to consider. I would agree that it's not our strongest fact there. But I think the evidence in the record does show that although other people were late to meetings, nobody else, none of the white employees had been treated to that sort of humiliation. So I think it's a fact that the jury could consider. But standing alone, I would agree that it wouldn't be dispositive. Okay. And the record does have instances of white employees who were late to meetings and not chastised? It has testimony from other members of that team who say that that's the only time that she had ever seen somebody berated like that for being late to a meeting. We don't have specific details about when those other events occurred, but we do have that testimony. Anecdotal. Anecdotal testimony, correct. Are the anecdotal descriptions related to race? I mean, do we know that there were—is it specific enough to tell us that there were other occasions where white employees were not chastised and that this is the only time a black employee was late and that she was singled out? No. So she's the only black provider in the clinic, so all of the other instances would have been white employees. Okay. Thank you. Ms. Schumacher. Good morning. May it please the Court. I'm Bowen Rickert Schumacher, and I represent the Department of the Army in this case. The district court correctly granted summary judgment in favor of the Army for three reasons. First, Ms. Buckley cannot establish race discrimination through her circumstantial case under any standard or framework. Second, the undisputed evidence below doesn't support a retaliation claim. And finally, the complaint of conduct doesn't rise to the level of a hostile work environment or a retaliatory hostile work environment. It's best to start looking at the remedies sought in this case, as Judge Abudu rightly noted. In this case, the amended complaint, which can be found at docket 16, seeks several things in the prayer for relief. All of those things are backwards facing except for one. The one forward facing thing that Ms. Buckley sought at the district court level was related to her sex discrimination claim, which was dismissed by the district court on a motion to dismiss based on failure to exhaust. So all of her claims for relief are backwards facing. They're all make-whole remedies that she's seeking. Because of that, the Supreme Court's decision in BAB dictates that we need to apply the higher causation standard associated with but-for. Therefore, my colleague's discussion this morning about the BAB standard actually doesn't apply in this case. Because the remedies she's seeking, as stated in her amended complaint, are backwards facing, any claim that she brings to this court must be proven to the higher but-for standard. Because we're looking to a higher but-for standard, sort of a pre-BAB standard, we can use the McDonnell-Douglas framework, with which this court is well familiar. Under the McDonnell-Douglas framework, Ms. Buckley can't establish a claim for race discrimination. First, she's unable to demonstrate the existence of a comparator. While she claimed that there were other white employees in the TBI clinic who were treated better based on their race, no one was similarly situated to her in all material aspects. While Ms. Buckley may have been contemporaries with them or with colleagues, she's been unable to put forward any evidence that anyone else in the TBI clinic committed not one but two substantiated HIPAA violations. But what about her dispute about it being two? Yes, Your Honor. Your Honor, if I may, there is mention in the record below of a 2014 violation that was an informal violation. She was educated about HIPAA in 2014 by Dr. Ribeiro. She received additional HIPAA training in 2017. Then in April of 2017 is when she sent an email that included unredacted patient information, and it was sent to an unauthorized recipient. That email was reviewed by Ms. Beverly Simmons, as noted, who was a HIPAA privacy specialist. However, the Army didn't authorize Ms. Simmons to give any type of opinion on whether or not this was a HIPAA violation. The Army's policy and procedure was to submit this to Captain Davis, who was the chief of the patient administration division, for independent investigation, and that's what happened here. So it's the government's position that Ms. Simmons was unauthorized to provide any opinion on a HIPAA violation, whether it was or was not substantiated, and therefore that's an irrelevant consideration. When the complaint went to Captain Davis, a neutral, independent third party who conducted his review and analysis, he found that it was a substantiated HIPAA violation. She committed a second HIPAA violation in July of 2017 when she took the same patient records to Congressman Sanford Bishop's office. That, again, went through the proper channels that the Army went up to Captain Davis, who again confirmed that there was a second substantiated HIPAA violation. Those HIPAA violations were part of the reason that she was proposed to be terminated, and Major Miller, her second-tier supervisor, set out all of the reasons that her proposed removal was appropriate. Is it correct, though, excuse me, that there were other individuals who also had HIPAA violations but didn't experience the same level of punishment? Your Honor, the record below reflects that there is a variety of discipline that can be imposed on Army employees who commit HIPAA violations. That's completely consistent with Army practice and is completely consistent with the table of penalties. So the answer is yes, there were others who committed HIPAA violations but didn't experience as severe a penalty? Your Honor, yes, the record below reflects that there are different people who received different levels of discipline, but those are based on each case, they're based on the uniqueness of those things. And again, it's consistent with the Army's progressive discipline policy. Would that be enough to consider those individuals comparators, even if they didn't necessarily have the same job title, they committed the same offense and had a different result, more favorable result? Your Honor, the record doesn't have enough information to prove or to demonstrate that those are appropriate comparators. As the Eleventh Circuit has set out in the Lewis case, they must be similar in all material aspects. Let me make sure I understand something about that evidence. I thought the evidence was that there were employees who were either discharged or allowed voluntarily to resign of different races for HIPAA violations, including white women, and that the lesser discipline, there were employees who received the lesser discipline for HIPAA violations who were black. And so it seemed to me that even if we consider them comparators, it doesn't support an inference of racial discrimination. I would agree with you, Your Honor. Did she also make national origin arguments? Those were not decided on summary judgment or raised in the summary judgment level, and those are not before the court today. Can I direct your attention to the hostile work environment claim? Yes, Your Honor. The traditional one, not the retaliatory one. Yes, Your Honor. I have some serious concerns based on the allegations that are brought here, which are that she effectively had her job undermined at every step, that Dr. Ribeiro told patients, sometimes in front of her, that she couldn't do her job, that she was, quote, an angry black woman, unquote, and encouraged them to complain about her, putting the idea into their heads before she had even attempted to help them. And, you know, that's where she gets the patient referrals from. And if the doctor who is supposed to be referring patients to her is doing everything he can to undermine white patients' trust in her and not referring white patients himself to her, and those are the allegations, how is that not a hostile work environment? How is she supposed to do her job when the very person who is supposed to be sending her patients so that she can do her job is not sending her white patients and is undermining her relationship with any white patients she receives from anyone else? Your Honor, I would first say that many of the allegations on which the plaintiff relies are unsubstantiated or are speculative. And I would caution this Court in relying on facts that, again, are not substantiated or are speculative. Well, didn't she testify to that? Yes, Your Honor. But the theory that Dr. Ribeiro was saying certain things to patients, she didn't have firsthand knowledge of that. She was making assumptions. She was speculating about things that were happening to which she was not privy. So I would, again, caution the Court to assume certain facts that are not in evidence. In terms of... Well, didn't he make a statement in front of her to one of the patients? The record below reflects that Dr. Ribeiro participated in allegedly uncomfortable behavior towards Ms. Buckley. However, we believe that the record does not establish that that type of treatment is related to her race. The plaintiff... Okay. I'm sorry. So, did she or did she not say that Dr. Ribeiro said in front of her something to the effect of, Ms. Buckley has angry black woman syndrome to a patient? Did she... Is that in the record? Yes, Your Honor. That is in the record, but so is Dr. Ribeiro's... Okay, but then there's a material question of fact. Yes, Your Honor. Why isn't that a material question of fact? If that is a material question of fact and we can say that it is... Well, let's not just say it is. If you think it's not, tell me why it's not because maybe I'm missing something. It seems to me like it is, but maybe I've missed something. No, Your Honor. If Mrs. Buckley says that she was called an angry black woman in front of a patient and Dr. Ribeiro said she wasn't, then we have a he said, she said on that fact. And so that's a material question of fact. On that one issue, perhaps we would agree. But that alone... But we would agree. We would agree. Let's agree we have a material issue of fact about that, okay? Yes, Your Honor. We'll agree. But that still doesn't rise to the level of a hostile work environment in which the plaintiff must demonstrate that there is behavior that is sufficiently severe or pervasive to alter the terms and conditions of employment. Well, you would agree, though, that if there were sufficient evidence in the record to establish at least a material dispute of fact over whether he was regularly doing this with patients and particularly with white patients and was diverting white patients from her, that there would be enough to establish a hostile work environment. Your response is only that there isn't that evidence. Am I understanding you correctly? Yes, Your Honor, you are. Okay. I don't believe that there's sufficient evidence to demonstrate that there's this consistent pattern and practice of patient reassignment. Dr. Ortiz submitted a declaration which said that there was this pattern and practice of patient reassignment, but respectfully to Dr. Ortiz, he didn't have any insight into the patient reassignment process. That process happened. There was discussion during the multi-D meetings in which everyone would participate together, but patient decisions were not something that Dr. Ortiz had full insight into. But where would I look in the record to find that there's no material dispute of fact about whether Dr. Ortiz would have had insight into why patients were reassigned? The record talks about how patient decisions were made. It talks about the uniqueness of patient evaluation, the uniqueness of patient assignment, the uniqueness of these multi-D meetings where things were discussed, and how Dr. Ribeiro alone was in charge of patient assignment and the other primary care providers, which Dr. Ortiz was not. Because Dr. Ribeiro and the other primary care providers were responsible for patient reassignment, Dr. Ortiz just doesn't have the same type of insight into it. Additionally, Ms. Buckley's own medical records note that... So just to be sure I understand, Dr. Ortiz, there is evidence in the record that indisputably establishes that Dr. Ortiz had no knowledge of patient reassignment procedures. Is that what you're saying? The record establishes that only primary care providers made patient reassignments, and to the extent that Dr. Ortiz comments or observes patterns and practices, those are based not on clear discussions or anything else, but it's based on his speculation and his assumptions, which can't be the basis of an inference in favor of discrimination. This court in Martin v. Financial Asset Management has said as clearly in 2020 that inferences in favor of an employee can be based only on evidence, not on speculation, and we don't believe that the plaintiff has put forward sufficient evidence to establish any of this patient reassignment based on race. Ms. Buckley's notes... If we go back to what evidence might support the hostile work environment claim, as I understand it, Ms. Buckley is relying on four things, one of which it just seems to me is not necessarily connected to race, the being late for a meeting, and it appears to be undisputed she was. But not only do we have Ribeiro calling her an angry black woman in front of at least one patient, but we have Sue asking whether her children had the same father. Now, it appears to me there's no evidence that that is in front of anyone else. I'm not sure about that. Ribeiro and Cooper saying her job was so easy a monkey could do it, which I think there's a reasonable inference that that can be about race. Is your argument that none of those are severe enough or those collectively aren't pervasive enough? This is over, what, a three-year period? What are we to do with these? I would argue, number one, that on the facts that context is important and that not all of those are about race. For example, the monkey comment. The comment was made that a monkey could do Ms. Buckley's job, and that job was delegated down to an aide. That was delegated away from a licensed authorized provider like Ms. Buckley and was given to someone else who was more technical. So your argument is it's not that she was compared to a primate, but that the job itself was. Correct. So we would not agree that that by itself was a monkey. Is that the only inference to be drawn from that? Your Honor, based on the context, we think pretty clearly that that was to indicate  that the job was something that was routine, was rote, could be done by someone who was not necessarily a licensed provider, but by someone who was an aide or a technician. Would you agree, though, that it's a very different thing to say that a monkey could do it to a black woman as opposed to saying a five-year-old could do it? I see my time is out. You may answer that. Yes. The comment, the use of the term monkey can play into racial stereotypes, and we are not saying that the behavior is appropriate or that the comment was appropriate. We're not defending the comment as being a gold standard and what you should say to your colleagues, especially when you're, again, saying them in the context of a black female. Or even the bronze standard. Yes, right, or even the bronze standard. What we're saying is that taking into account the consideration and reviewing all of these actions together, they don't combine to establish the severe or pervasive conditions that are necessary to demonstrate or to show a hostile work environment. I just have one more question in terms of temporal proximity. My notes show that she filed her first complaint in November of 2016, and then she was removed around July 2017. Is that right? Yes, Your Honor. Her fourth HIPAA complaint was filed in November of 2016, and you're correct that there was an internal memo recommending her removal in June of 2017, and then the notice went to Ms. Buckley in July of 2017.  I believe that even though there was an argument that there was a lot of months that passed between the 2016 complaint and the 2017 removal, but that her EEOC complaint was still pending at the time of her removal. Is that correct? Yes, Your Honor, but I would point to the fact that Major Zhu became aware of her EEO activity in January of 2017, and Major Miller became aware in 2016. So looking at the temporal proximity between the awareness in January 2017 and the proposed termination in July of 2017, that seven-month time span is just too great and far exceeds the limit that this Court has previously recognized can create an inference of discrimination. I have another question for you. I'm looking at Dr. Ortiz's declaration. He says he makes the declaration based on personal knowledge and information available to him. And he says Dr. Ribeiro would frequently refer white patients off base to see a speech pathologist despite the fact that a decision was made during the multi-D meetings that a patient should see Ms. Buckley. So my first question is, was Dr. Ortiz at multi-D meetings? Yes, Your Honor, he was. Why doesn't that create a material dispute of fact? If I may, Your Honor, respectfully, I think that there are other things that can go into it like Ms. Buckley noted in her medical records. Oftentimes she would say to a patient, I think it's best to refer you to a different provider or I think it's best to refer you off post. And so she herself would sometimes recommend to white men that they be seen by different providers or that they be seen, again, off post. So Dr. Ortiz's outside assumptions and speculation about what was happening isn't sufficient to create the causal connection to say that this is discriminatory. Okay. If there's no further questions. Okay. Ms. Vinson, you've saved three minutes. Okay, I want to address a couple of points really quickly and then move on to some of the more substantive questions that this Court had. First, on the relief, the prospective versus backwards-looking relief. The complaint, the amended complaint, was filed before the Supreme Court's decision in BAB. It was filed before this Court's decision in BAB 2. That distinction didn't exist yet. She didn't have the benefit of that. The remedy also requests, as complaints do, sort of all other appropriate relief. And so I don't think she should be restricted to that specific piece. The second piece of that is that it doesn't... The relief... There are two different violations here. The government can still violate the federal sector Title VII by treating her differently in the decision and the removal process. And then the but-for analysis is a different... For removal is a different piece. The second piece I want to address is that, as far as the hostile work environment, this is different, as I think Judge Abuda, you pointed out, that this is altering the working conditions in terms of the fact that it's affecting her patient caseload. It may not rise to the level of severe and pervasive in terms of how uncomfortable she was and how sort of traditionally hostile she was treated. But in terms of altering her working conditions, it was, in fact, diverting patients from her and changing her patient caseload, which she said was 50-50 when she started. And after Ribeiro came and several years into this, she was seeing predominantly black patients.  And then on the timing, I want to address the second substantiated HIPAA violation. This is the government, again, using another pretext basis for this. This decision to terminate and remove her... You know, on the hostile work environment, I thought it was the harassment itself that has to alter the terms. I thought that's the nature of that kind of claim. So it's that you belong to a protected group, you've endured unwelcome harassment, the harassment must have been based on a protected characteristic, and the harassment was severe or pervasive to alter the terms and conditions of the employment. I think harassment can be more insidious than outright comments. I'm just trying to understand your claim. And as I was understanding it, you had these discrete acts that you were saying were creating a hostile work environment. What you just said, though, seems to me to be a very different kind of argument and not one that really lines up with that cause of action. I don't think that that's... Again, I think it's more than just those pieces. I think you can harass somebody by telling them they can't see white patients. I mean, I don't think you have to be using racial slurs to harass somebody based on their race. Okay. I'm not sure I understand that the way I thought I had understood this claim. What was the last point you said you wanted to make? The last point I wanted to make is that the government relies pretty heavily on this comparator piece, and I think I submit to the Court that that is no longer valid under BAB. This Court has three unpublished opinions talking about whether or not McDonnell-Douglas still applies, and the comparator analysis is, I think, directly conflicts with the hypothetical that BAB gives about the age discrimination and the scores on the test, because if we applied a true comparator analysis to the facts in BAB, then we would never have gotten to the next step on that. And so I think the comparator analysis is incompatible with BAB. Okay, Ms. Vincent, we have your case. Thank you. We're going to move on to the third one.